UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Mr. James Harris
Dr. David Harris III,
12853 Hoadly Manor Drive
Manassas, VA 20112
301-830-2101
205-356-3853

       Plaintiffs,

v.

Muriel Elizabeth Bowser, in her official capacity
As Mayor of the District of Columbia
John A Wilson Building
1350 Pennsylvania Avenue NW
Suite 316
Washington D.C.  20004

District of Columbia
A Municipal Corporation
441 4th Street
Washington, D.C. 20001
Registered Agents
-Tonia Robinson
-Gayle Rivers
-Marjorie Thomas
-Regina Brown,

District of Columbia Metropolitan Police Department
Peter Newsam
in his official capacity
As District of Columbia Chief of Police
300 Indiana Avenue, N.W.
Room 5059
Washington, DC 2001

District of Columbia Metropolitan Police Department
Police Officers in their official capacity
300 Indiana Avenue, N.W.
Room 5059

Case: 1:19−cv−00886  JURY DEMAND
Assigned To : McFadden, Trevor N.
Assign. Date : 3/26/2019
Description: Pro Se Gen. Civ. (F−DECK





RECEIVED
Mail Room

MAR 16 2019

Angela D Caesar Clerk of Court
U.S. District Court District of Columbia

RECEIVED

MAR 16 2019

Clerk, U.S. District and
Bankruptcy Courts

1

Washington, DC 2001
-Maxwell Poupart (#3791)
-Adam Floyd (#7596)*
-Detective James Gamble (#D-21762)
-Kfir Gamliel (#2736)
-Chukwuemeka Lantion (#4741)
-Korey Marable (# 10115)
-Christopher Dorsey (#7741)

Maxwell Poupart
In his individual Capacity
127 U Street
Washington DC 20001-1605
315-737-5185

Douglas Scott Meyer
1160 1ST NE #1136
Washington DC  20002-4872
646-592-0221

Douglas Scott Meyer
201 W 11th Street #6D
New York, NY 10014
Washington DC  20002-4872
646-592-0221

The Art of Lounge, LLC ABRA-076801
Town/In Stereo
1301 Rhode Island Ave NW #3
Washington, DC  20005-3700

United States Department of Justice
The attorney for the District of Columbia
Jessie Kong Liu
555 Fourth Street NW
Washington DC 20530
UNITED STATES

Serve: Office of the Attorney General
C/O the Honorable Karl A. Racine
Attorney General for the District of Columbia
441 4th Street, NW
Washington D. C.  2001

Defendants.

---

*COMPLAINT*

---

COMES NOW the Plaintiffs Mr. James Harris (Mr. Harris) and Dr. David Harris III (Dr. Harris),

brings this Complaint against Defendants Muriel Elizabeth Bowser, in her official capacity as

Mayor of the District of Columbia, District of Columbia A Municipal Corporation, United States

Department of Justice  Attorney for the District of Columbia Jessie Kong Liu, Peter Newsam in

his official capacity as District of Columbia Chief of Police, District of Columbia Metropolitan

Police Department Police Officers in their official capacity [Maxwell Poupart (#3791), Adam

Floyd (#7596)*, Detective James Gamble (#D-21762), Kfir Gamliel (#2736), Chukwuemeka

Lantion (#4741), Korey Marable (# 10115), Christopher Dorsey (#7741), Maxwell Poupart in his

individual Capacity. Douglas Scott Meyer in his individual Capacity and The Art of Lounge, LLC

Town/In Stereo.

---

*PARTIES*

---

1.      Plaintiff Dr. David Harris III is a resident of Manassas, VA and active duty member of

        the Department of Defense Armed Services

2.      Plaintiff Mr. James Harris is a resident of Manassas, VA and Budget Officer for NGA

3.      District of Columbia is a municipal corporation a constituted body corporate for

        municipal purposes, and may contract and be contracted with, sue and be sued,

        plead and be impleaded, have a seal, and exercise all other powers of a municipal

corporation not inconsistent with the Constitution and laws of the United States and the provisions of this Code.

4.      Upon information and belief Defendant The Art of Lounge LLC is a corporation incorporated under the laws of The District of Columbia and is registered to conduct/transact business in the District of Columbia.  Additionally, The Art of Lounge LLC is a registered owner of Town Danceboutique. The Art of Lounge principal place of business is the District of Columbia.

5.      Defendant Douglas Meyer is the Operating Manager of Town Danceboutique and place of residence is located in the District of Columbia

6.      Upon information and belief, Defendant Maxwell Pourpart is a resident in the District of Columbia

7.      §5–101.01 District of Columbia Metropolitan Police Department

8.      Peter Newsam District of Columbia Chief of Police

9.      Muriel Elizabeth Bowser, Mayor of the District of Columbia

10.     United States Department of Justice and Attorney for the District of Columbia Jessie Kong Liu in her official capacity

11.     On information and belief, all Defendant Officers are and were at the time of the events complained of herein employed by the District of Columbia as Police Officers.

*JURISDICTION & VENUE*

12.    This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and

1343(a), the Constitution of the United States, and this Court's supplemental

jurisdiction powers.

13.    Venue is proper under 28 U.S.C. § 1391(b).   On information and belief, all

defendants reside in this judicial district, and the events giving rise to the

claims asserted herein occurred within the district. A civil action in which a

defendant is an officer or employee of the United States or any agency thereof

acting in his official capacity or under color of legal authority, or an agency of the

United States, or the United States, may, except as otherwise provided by law, be

brought in any judicial district in which (A) a defendant in the action resides, (B) a

substantial part of the events or omissions giving rise to the claim occurred, or a

substantial part of property that is the subject of the action is situated, or (C) the

plaintiff resides if no real property is involved in the action. Additional persons may

be joined as parties to any such action in accordance with the Federal Rules of Civil

Procedure and with such other venue requirements as would be applicable if the

United States or one of its officers, employees, or agencies were not a party.

14.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under

color of law of Plaintiff's rights as secured by the United States Constitution.

*BACKGROUND*

15. February 13, 2018 Plaintiffs filed complaints with the Office of Police Complaints and the Internal Affairs Office of the Metropolitan Police Department. Subsequently, the Office of Police Complaints offered mediation for the allegations, and the plaintiffs accepted, however, the OPC never executed this option. Additionally, the organization proceeded with the investigation against the agency's policy and concluded the investigation with incomplete information specifically the bodyworn camera statements from Officer Noor Lach Hab which was miscategorized and not supplied as support of Mr. Harris and Dr. Harris complaint. Moreover, the Chief Investigator reduced the actions by the officers as Mr. Harris was wedged in the organization's transport as indicated by, 20180210_-_transport_-_3D.mp4- Ofc. Lantion.mp4.

16. Plaintiffs did not receive a response from the Metropolitan Police Department or Internal Affairs Division from the complaint IS# 18000497 which was acknowledged by Mark Jackson Sergeant Patrol Services North Metropolitan Police Department.

17. Since the governing bodies acknowledged receipt of the complaints and were advised that the plaintiffs intend to seek compensation from the agency on February 13th, 2018. The six-month notification requirement has been satisfied. The complaint specifically states "As a result, James Harris intends to seek compensation for the cited infractions."

18. Therefore, the plaintiffs exhausted all available administrative remedies to cure the infractions imposed by the defendants.

*FACTUAL ALLEGATIONS*

19.  February 10th, 2018, Mr. Harris, Dr. Harris, Stephanie Wilson, and Natalie Wilson attended a Drag Show at Town Danceboutique a entitle under the Art of Lounge LLC around 10:15 pm.

20.  At this time the establishment was occupied with patrons that took up all available seating. Therefore, the parties stood near the stage/dancefloor and bar.  The show commenced at 10:30, and after the fourth performer concluded their act, Mr. Harris proceeded to the bar and purchased two drinks. Upon his return there where a group of white men behind him who recently arrived at the establishment. After Mr. Harris gave Dr. Harris one of the drinks, he purchased he begin to watch the next performer which it was at this time he begins to have issues with the men behind him.

21.  Specifically, one of the guys Jon Squicciarini had an issue with Mr. Harris because he was significantly taller than he was, and he could not obtain an optimal view of the show.

22.  However, Mr. Harris explained to him that he was already established, and he was there with three other people.

23.  As a result, Jon Squicciarini was not satisfied with his response and began antagonized Mr. Harris by hitting him in the back. (identified on surveillance video D01-CH02.mp4 3:41)

24.     Upon the initial contact Mr. Harris informed the gentlemen to cease and that it was

        not a good ideal to touch him. However, the guy did not stop his actions and then

        directly stated to Mr. Harris, "What are you going to do about it" so at this point Mr.

        Harris stuck the guy back. Once this altercation occurred several white guys begin to

        attack him roughly eight or more men.

25.      As a result, Mr. Harris had no other alternative but to defend himself against these

        men.

26.     This situation occurred rapidly, and several guys approached Mr. Harris to do

        physical harm to him.

27.     Dr. Harris attempted to deescalate the altercation. In part, Dr. Harris was able to

        distance Mr. Harris from the majority of the men; however, it was observed that

        one white male was injured and bleeding.

28.     This particular gentleman Douglas Scott Meyer was part of the group of men that

        was in the altercation with Mr. Harris.

29.     At the point, the only individuals that were escorted outside of the facility were Mr.

        Harris

30.     Subsequently, the police were called as a result of the incident, and one specific call

        was made by Douglas Meyer.

31.      During the timeframe between the end of the incident and the arrival of the

        Metropolitan Police Department (MPD) the men that provoked the incident left the

        scene along with most of the individuals.

32.    Several uniformed officers arrived at the club location requesting identification from Dr. Harris and Mr. Harris in return Dr. Harris requested for them to produce a card/business card however all officers declined his request as indicated by the Office of Police Complaints response dated August 22, 2018, by the Investigations Manager Natasha Smith.

33.    Dr. Harris presented his Active Duty Military ID Card to satisfy the officers' order.

34.    Additionally, at this point, Mr. Harris was approached by several officers. Concurrently Dr. Harris was asked for additional identification (drivers licenses) which he then informed the officer that he did not have any additional identification and he was not driving.

35.    The officer Korey Marble then left with Dr. Harris identification and never returned.

36.    As a result of the failure to provide a business card and detail who the officers were Dr. Harris called 911 and explained his frustration and that his Military ID was confiscated for no reason.

37.    Moreover, he requested that a supervisor come to the scene because he was not receiving information about the circumstances of what was going on with his husband, Mr. Harris.

38.    Shortly after Dr. Harris called 911, Mr. Harris was placed in handcuffs and told that he was being detained. Which was upon MPD officer Maxwell Poupart arrival to the scene and he immediately places him in handcuffs which he was on the phone. (Poupart Bodyworn Camera at 2:51)

39.    Dr. Harris attempted to talk with the officers to explain what happens; however, he

       was told to step back on the sidewalk. As time progressed Dr. Harris watched as Mr.

       Harris appeared to be in agony and yelled to him was, he ok and did he need

       medical attention.

40.    Mr. Harris stated that he did and that he was hurt.  It appeared that a police officer

       attempted to place him in a vehicle but was unsuccessful.

41.    About ten minutes later Dr. Harris was approached by two uniform female officers

       (Desiree Walker and Maria Mendoza) who introduced themselves as being part of

       the LGBT division and took his information.

42.    Moreover, he received business cards from both of them. It was at this point a

       medic arrived, however, it appeared that the medic was for the manager Douglas

       Scott Meyer.

43.    Additionally, another DC vehicle came to transported Mr. Harris; however, he was

       never informed that he was under arrest as required by Interrogation, for purposes

       of Miranda.  The Court, in In re I.J, reasoned that by asking a detained suspect

       "what happened" for no other purpose but to illicit an incriminating response is

       indicia interrogation. Id. at 264-265. Here Mr. Harris was detained and Off. Marable

       had already decided he was going to be locked up for simple assault. No other

       individuals involved in the altercation that night was placed in handcuffs.

44.    It was clear that after speaking with Meyer, Off. Marable wanted to speak with Mr.

       Harris for the sole purpose of obtaining incriminating statements. This became even

more obvious when, even faced with a conflicting story given by Mr. Harris, Off. Marable turns around minutes later and tells another officer that Mr. Harris is "about to be locked up."

45.    Mr. Harris expressed that he did not hit the manager and informed the officers of the same information. However, all officers exercised prejudicial treatment and only arrested Mr. Harris.

46.    Maxwell Poupart (#3791) specifically identifies in his grand jury testimony dated Friday, May 4, 2018 that "We weren't on a call at the time that this came out and we were nearby, so I just responded" (pg. 5) which he also testifies that he knew Douglas Meyer and maintained a friendship with him.

47.    The Assistant United States Attorney reiterates this fact in her Notice of Filing Dated May 24, 2018. She specifically states, "Officer Pourpart is personal friends with Complainant Douglas Meyer. They have known each other three years and met outside of work" (Richards, pg. 2).

48.    Moreover, NO officer detail to Mr. Harris or Dr. Harris the reason for their presence except for the fact that Douglas Meyer was injured.

49.    Dr. Harris and Mr. Harris later discovered that the complainant and manager of the establishment Douglas Meyer posited to the officers on the scene specifically his friend Officer Poupart that Dr. Harris and Mr. Harris was fighting, and he attempted to break-up the altercation and was hit by Mr. Harris. Additionally, the Assistant United States Attorney details on her May 24th, 2018 notice of filing that.

"Complainant Dougie Meyer in body-worn camera indicate that the defendant and his husband had been fighting during the incident and that the defendant punched Mr. Meyer as the defendant was trying to punch his husband…. Mr. Meyer is not sure why he told officers on body camera that the defendant and his husband had been fighting when Mr. Meyer had the realization at some point during the incident that this was not the case" (Richards, pg. 2)

50.   Moreover, Officer Poupart sought to charge Mr. Harris with a hate bias crime due to the fact that Jon Squicciarini stated Mr. Harris called him a faggot disregarding that Mr. Harris is married to Dr. Harris.

51.   The actions exhibited by the police officers on the scene were racially bias supported by the fact the officers only took statements from the white witness. Moreover, the officers did not conduct an investigation as it would have been clear to the officers that Mr. Harris and Dr. Harris were not fighting that night.

---

*Count I*

*42 U.S.C. § 1983:  False Arrest*

---

52.   Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

53.   As described in the preceding paragraphs, the Defendant Officers unlawfully detained and falsely arrested Plaintiff without legal justification or probable cause.

54.   In accordance with GO-PCA-304.01 investigating officers have a duty to perform a list of initial tasks. Specifically, the investigating officer is responsible for locating a possible witness to the offense or persons who may have essential information to

the offense. In regard to this incident, the investigating officer failed in this task and

did not complete a thorough investigation.

55.    The investigating officer did not interview Dr. Harris the spouse of Mr. Harris as he

was present throughout the entire altercation nor two other witnesses that were

present. The distinction of demographic was evident, and the victims were all White

Males, and the suspect was a Black Male, as a result, the investigating officer

violated D.C. Official Code § 2-1 401, et.seq. District of Columbia Human Rights Act

which states:

"members shall not discriminate, either in the enforcement of the law, or in the
provision of police service, on the basis of race, color, religion, national origin, sex,
age, marital status, personal appearance, sexual orientation, gender identity and
expression, familial status, family responsibilities, matriculation, political affiliation,
genetic information, disability, source of income, status as a victim of an intra-
family offense and place of residence or business."    However, the officers still
continued to effectuate the arrest, detention, and prosecution of Plaintiff for the
charge.

56.    Douglas Meyers false statements contributed to the caused infraction of policies,

practices, laws, regulations of the District of Columbia ("DC") and the Metropolitan

Police Department (M.P.D.)

57.    The misconduct described in this Count was undertaken with malice,

willfulness, and reckless indifference to the rights of the Plaintiff.

*Count II*

*42 U.S.C. § 1983:  Excessive Force*

58.    Each of the paragraphs of this Complaint is incorporated as if fully

restated herein

59.   As a result of the Defendant Officers' unjustified and excessive use of force, Plaintiff suffered pain and injury, as well as emotional distress. This conduct violated the Fourth and Fourteenth Amendments to the United States Constitution, and hence 42 U.S.C. § 1983.

60.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

61.   The aforementioned actions of the Defendant Officers were the direct and proximate cause of the constitutional violations, and the attendant injuries resulting therefrom, as set forth above.

62.   As a result of the Defendant Officers' unjustified and excessive use of force Plaintiff has, as a direct and proximate cause, suffered pain and injury, including emotional distress.

63.   Mr. Harris is a 42-year-old 6'5 gay black male with a medically certified disability while the other parties were all white males.

64.   As a result, Korey Marable and assisting officers exercised prejudicial treatment of James Harris without conducting a full investigation due to his race, sexual orientation, and personal appearance.

65.   In accordance with GO PCA-502.07 Officers should exercise significant care when a subject is suffering from or complains of injuries, he or she shall be immediately taken to the Hospital for examination and treatment. During the course of Korey

Marable's response to the scene, James Harris expressed that he was injured and needed medical attention; however he was not taken to the hospital. This is a significant infraction due to the fact that James Harris is covered under the American with Disabilities Act and has a qualified medical disability.

66.     In accordance with GO PCA-502.01 Officers have a due diligence to transport suspects with care; however, officer Korey Marble failed to exercise proper care and follow this order.

67.     Initially, James Harris was forced into a vehicle that was inadequate for his size resulting in injuries to his body.

68.     As a result, James Harris was transported in a wagon however he was not strapped down nor provided instruction of the available straps in the vehicle. In accordance with the amendment, EO-16-007 Members shall ensure that the prisoner is belted into the seat; however James was not belted into the seat which to the contrary he wedged in-between the seat and was stuck. James suffered additional injuries due to the officer's negligence.  These actions are vivid on  20180210_-_transport_-_3D.mp4- Ofc. Lantion.mp4.

69.     In accordance with GO-PER-201.26 M.P.D. officers have a duty to Be courteous and orderly in their dealings with the public furthermore members shall fulfill proper requests for information or assistance, or they shall aid the person in otherwise obtaining the requested information or assistance and lastly when requested to do so, members shall give their first and last name and badge numbers in a respectful and polite manner.

70.     This incident specifically highlights significant improvement areas for the

        organization as a whole. Dr. Harris verbally and directly asks for detailed

        information of the officers on the scene, a business card, and the reason for them

        arresting Mr. Harris. However, he did not receive any information regarding this

        situation nor did he received a card with CCN# nor did anyone interview him to

        inquire about what transpired since he was the alleged victim.

*Count III*

*42 U.S.C. § 1983: Due Process/Brady Violation*

71.     Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

72.      Defendants deliberately hid, and/or prevented the creation of impeaching and

        exculpatory evidence.  Specifically, Defendants:

        Withheld and miscategorized Officer Mendoza'a Bodyworn Camera Video and

        according to the Assistant United States Andrea Duvall statement of opposition to

        Bady Violation represents "A synopsis of Officer Mendoza's bodyworn camera video

        reflects the following:

        Officer Mendoza's bodyworn camera video is approximately 40 minutes and 15
        seconds long. Officer Mendoza approaches the defendant's husband and his sister,
        Officer Kearney, and they discuss having been at the Academy together. Officer
        Kearney then identifies the defendant's husband as her brother's husband, and
        points to two female witnesses, indicating that they are her cousins. She then goes
        on to state that she doesn't understand why her brother is being arrested when he
        was jumped by six different individuals. (Mendoza BWC, 27:55-29:00). At the
        defendant's husband's request and in response to his complaint that no one was
        following protocol, Officer Mendoza asks Sergeant Hawkins to talk with him. The
        defendant's husband then begins telling Sergeant Hawkins that others got mad
        because the defendant was tall. He points to the two female witnesses and said that

they heard it. These two female witnesses, who are also the same witnesses who spoke with Officer Lach Hab, narrate a version of events that suggest that the complaining witness instigated the physical altercation and complained about the defendant's height. They also indicate that the complaining witness had nudged the defendant in his back and kept saying "stuff" to the defendant. The two witnesses also appear to suggest that the complaining witness's friends were assaulting the defendant. (Mendoza BWC, 32:34-38:30). During portions of Mendoza's bodyworn camera video, both Officer Walker and Sergeant Hawkins are visible." (Duvall, pg. 8-9).

73.    Assistant United States Andrea Duvall presents a synopsis of miscategorized and

withheld Officer Lach Hab's Bodyworn Camera Video as follows:

"A synopsis of Officer Lach Hab's bodyworn camera video reflects the following: Officer Lach Hab's bodyworn camera video is approximately 14 minutes and 16 seconds long. Officer Lach Hab, who also appears to know the defendant's sister, Officer Kearney, greets her and asks how she is and what she is doing there, and Officer Kearney explains that the defendant is her brother. (Lach Hab BWC, 3:36-3:42). When Officer Lach Hab asks Officer Kearney what district she went to, Officer Kearney presses her for information about her brother and the investigation. (Lach Hab BWC, 3:55-4:00). Shortly after Officer Kearney leaves to walk over to the defendant's brother, Officer Lach Hab joins her to tell her that it was an assault. (Lach Hab BWC, 4:25-4:35). After the defendant's husband begins arguing that it was not an assault, Officer Kearney tells him to hold on, and Officer Lach Hab asks the defendant's husband if he was there. As the defendant's husband begins to relay what happened, the same two females depicted on Officer Mendoza's bodyworn camera approach and join the defendant's husband and sister, Officer Kearney. The defendant's husband tells the two females to tell Officer Lach Hab what happened and indicates that they saw everything. The two women then relay that one of the complaining witnesses was "nagging" the defendant and complaining about the defendant's height while pushing at him. One of the women indicates that the guy kept saying stuff and pushing at the defendant and that she tried to intervene because she knew "it was gonna get escalated for him hitting on him first." Both women indicate that the guy kept nagging and saying stuff. Officer Lach Hab asks, "What, like hitting on [the defendant]?" (Lach Hab BWC, 4:36- 5:58). Officer Lach Hab continues speaking with the defendant's husband, the defendant's sister (Officer Kearney), and the two female witnesses about what happened before walking over to Officer Poupart to relay the information. When speaking to Officer Poupart, Officer Lach Hab points out the two female witnesses to Officer Poupart and says that they said one of the complaining witnesses was hitting on the defendant and they kept telling him to stop. (Lach Hab BWC, 8:56-9:15). Lach Hab later tells Officer Poupart that she believes that it is

definitely hate bias because one of the witnesses said the "little guy" was hitting on him and he took offense to it, which is when he hit the "little guy with the scratches." (Poupart BWC, 25:46-26:00). She then goes on to indicate that the witnesses said the complaining witness with the laceration just got in the way. (Poupart BWC, 25:46-26:15)" (Duvall, pg. 9)

74.     In the manner described above, Defendant Officers deprived Plaintiff of Due

        Process in violation of the 5th and 14th Amendments to the United States

        Constitution.

75.     Defendant Officers' actions set forth above were so arbitrary as to shock the

        conscience.

76.     Such violations of the Plaintiff's rights were undertaken intentionally, with malice

        and willful indifference to Plaintiff's rights.

77.     As a result of the above-described wrongful conduct, Plaintiff has suffered pain and

        injury, as well as emotional distress.

78.     The misconduct alleged in this Count was undertaken while the Defendant Officers

        were acting within the scope of their employment.

79.     The misconduct described in this Count was undertaken with malice, willfulness,

        and reckless indifference to the rights of others.

*Count IV*

*42 U.S.C. § 1983:  Conspiracy to Commit Constitutional Violations*

80.     Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

81.     In an effort to find fault to use against the Plaintiff, the Defendants conspired

        amongst themselves and with other individuals to deprive the Plaintiff of his

constitutional right secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution. The Defendants refused to investigate the Plaintiff's complaint and refused to interview his witnesses.

82.    As discussed in greater detail above, the Defendant Officers conspired with each other to cause damage to the Plaintiff by:  a. Withholding exculpatory evidence and failing to fully investigate the incident moreover exhibiting excessive force relative to the Plaintiff;  b. Agreeing not to generate reports documenting their conduct to cover-up their own and each other's misconduct;   c. Agreeing to generate reports and other documents which omitted material facts relating to the arrest and containing patent falsities;  The aforementioned actions of the Defendant Officers were the direct and proximate cause of the violations of the United States Constitution discussed above, and the attendant injury and emotional distress resulting therefrom.

83.    Maxwell Poupart in his individual Capacity conspired with Douglas Scott Meyer to intentional manufacture false allegations and criminal charges against Mr. Harris due to their intimate relationship outside of their official capacity.

84.    Douglas Meyer acting within the course and scope of his employment with the Town Danceboutique and representing the organization unlawfully made false statements accusation, police reports.

85.    Specifically, accordingly, the government and its presentment of PPMS pertaining to Detective James Gamble, Officer Maxwell Poupart, Officer Korey Marable highlight that Officer Korey Marable has been reprimanded for the exact irregularities, in this

case, to include miscataloging body worm camera to exclude himself from incidents.

*Count V*

*42 U.S.C. § 1983: Failure to Intervene*

86.     Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

87.     As described more fully above, one or more of the Defendants had a reasonable opportunity to prevent the violations of Plaintiff's constitutional rights as set forth above.

88.     As a result of the Defendant failure to intervene, Plaintiff suffered pain and injury, as well as emotional distress.

89.     The Defendants' actions were undertaken intentionally with malice and reckless indifference to Plaintiff's rights.

90.     The misconduct described in this Count was undertaken by the Defendant Officers within the scope of their employment and under color of law.

*Count VI*

*Malicious Prosecution*

91.     Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

92.   As described more fully above, the Defendant Officers commenced, caused to be commenced, and/or continued a criminal proceeding against Plaintiff for which Defendant Officers knew there was no probable cause, and the criminal proceeding terminated in Plaintiff's favor in a manner indicative of innocence.

93.   The Defendant Officers' actions were undertaken intentionally, with malice and reckless indifference to the rights of others—specifically, the Plaintiff's.

94.   The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without probable cause, and they made written and other statements with the intent of exerting influence to institute and continue judicial proceedings.

95.   The Defendant Department of Justice Attorney Jessie Kong Liu violated Federal Prosecutor Ethics Act

"The prosecutor should not bring or seek charges greater in number...than are necessary to fairly reflect the gravity of the offense."

96.   ABA Rule 3.8: Special Responsibilities of a Prosecutor

97.   The prosecutor in a criminal case shall:
"refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause; (b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel; (c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing; (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; (e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes: (1) the information sought is not protected from disclosure by any

applicable privilege; (2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and (3) there is no other feasible alternative to obtain the information"

98.     Specifically, in this case, Jessie Kong Liu deliberately, knowingly and willingly sought

charges greater than are necessary to fairly reflect the gravity of the offense.

Additionally, the attorney was aware and had possession of evidence that disputes

the victims' allegations.

99.     Additionally, Jessie K Liu presented charges that were never initialed the night of

the incident which the government pursued this charged and ultimately failed to

achieve its obligation of the burden of proof. This was supported by an acquittal of

this charge on 03/18/2019 Charge Disposed – Acquittal.

---

*Count VII*

*§ 31–2231.05. Defamation Against all Defendants*

---

100.     Each of the paragraphs of this Complaint is incorporated as if fully restated herein.

101.     In an effort to find fault to use against the Plaintiff, the Defendants conspired

amongst themselves and with other individuals and made false statements on

certified documents to include Police reports, Affidavits, Gerstein Affidavit, Grand

Jury testimony,  Grand Jury Indictment, Witness Statements, Formal proceeding

testimony, to cause economic harm to the plaintiff  which creates a criminal profile

against the plaintiff.

102.   Mr. Harris and Dr. Harris are collectively and individually are high wage earners which their ability to earn income depends on a favorable criminal background. Additionally, the plaintiffs maintain assets in excess of $2.5 million and liabilities in excess of $1.8 million which are at jeopardy due to the Defendants actions.

*PRAYER FOR RELIEF*

Wherefore, the plaintiffs prays that the Court award the following relief:

1.   Issue an Order requiring the defendants to make the plaintiff whole by awarding compensatory damages and punitive damages at a minimum totaling the combined assets and liabilities of the plaintiffs that are in jeopardy due to the defendants' actions.

2.   An award of litigation costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1988 to the plaintiff.

3.   An award of realized litigation cost, expenses, and attorneys for the plaintiff's defense against the frivolous criminal charges and over prosecutions executed by the defendants.

4.   Punitive damages based upon the defendants' negligence and engagement of bad practices.

4.   Such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury as to all issues against all defendants.


Respectfully submitted,

Dr. David Harris III

Mr. James Harris